IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DONALD H. BROWN II,

    Petitioner,

v.

OHIO ADULT PAROLE AUTHORITY,[1]

    Respondent.

CASE NO. 2:19-CV-2826
JUDGE GEORGE C. SMITH
Magistrate Judge Chelsey M. Vascura

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner who is proceeding without counsel, petition for a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner seeks release from confinement imposed pursuant to a state-court judgment in a criminal action. This case has been referred to the Undersigned pursuant to 28 U.S.C. 636(b) and Columbus' General Order 14-1 regarding assignments and references to United States Magistrate Judges.

This matter is before the Court on its own motion under Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts ("Rule 4"). Pursuant to Rule 4, the Court conducts a preliminary review to determine whether "it plainly appears from the face of the petition and any attached exhibits that the petitioner is not entitled to relief . . . ." If it does so appear, the petition must be dismissed. *Id*. With this standard in mind, and for the reasons that follow, the Undersigned **RECOMMENDS** that this action be **DISMISSED.**

---

[1] Petitioner identifies the State of Ohio as the Respondent; however, because he apparently has been released on post-release control and is under the supervision of the Ohio Adult Parole Authority ("OAPA"), the OAPA would be the proper party Respondent. *See* Advisory Committee Notes, Rule 2(b) of the Rules Governing § 2254 Cases in the United States District Courts.

# I. FACTS AND PROCEDURAL HISTORY

Petitioner indicates that he was convicted after a jury trial in the Franklin County Court of Common Pleas on the charge of manslaughter, with a firearm specification. The Ohio Tenth District Court of Appeals summarized the facts and procedural history of the case as follows:

{¶ 2} On October 11, 2002, appellant was indicted on one count of murder, in violation of R.C. 2903.02. The indictment arose out of an incident on August 22, 2002, in which appellant fatally shot Joshua Green, age 18, at the Berwick Plaza Apartments located at 3094 Livingston Avenue.

{¶ 3} The matter came for trial before a jury beginning on July 22, 2003. At trial, the state presented evidence tending to show the following facts. Veronica Green, the sister of the shooting victim, testified that her family lived in a gang neighborhood and her brother, Joshua, who was five foot four inches tall and weighed 117 pounds, had encountered difficulties with other individuals in the neighborhood "messing with him." (Tr. 92.) Approximately one month prior to the shooting, Joshua purchased a gun for protection from an individual nicknamed "New Orleans." (Tr. 109.)

{¶ 4} On August 22, 2002, Veronica Green spent most of the day with her brother and she last saw him around 5:00 p.m. that afternoon. Later that evening, at approximately 8:00 p.m., Green received a phone call from her stepfather informing her that Joshua had been killed.

{¶ 5} Macaette Robinson was a resident of the Berwick Plaza Apartments during the events in question. Appellant frequently visited the apartments, and Robinson was acquainted with him. Robinson also knew Joshua Green, and Robinson was aware that Green possessed a gun. Green kept the weapon in a sock on the seat of his car. According to Robinson, Green "felt like his life was being threatened in Easthaven." (Tr. 175.)

{¶ 6} Robinson testified that Green visited the Berwick Plaza Apartments on August 22, 2002, and gave appellant a ride to a local drive-thru. After they returned to the apartments, Green discovered that his weapon was missing and he asked Robinson if he knew anything about the gun. Later that day, appellant showed Robinson the gun. Robinson subsequently informed Green that appellant had his weapon, but he advised Green, who was considerably smaller in stature and weight than appellant, to go home. Green eventually left, but he returned about 15 or 20 minutes later. After driving through the neighborhood, Green left again and went to the residence of a friend, Anson Ford.

{¶ 7} Green told Ford he was upset because someone had stolen his gun at the Berwick Plaza Apartments. At one point during Green's visit, Ford left the room

briefly to go to the restroom and, when he returned, Green was gone. Ford then discovered that a gun he kept in a drawer was missing, so he drove to the Berwick Plaza Apartments.

{¶ 8} After leaving Ford's residence, Green returned to the Berwick Plaza Apartments and began arguing with appellant about the missing weapon. Appellant denied having the weapon, but Green observed the weapon on appellant and reached for the gun. Robinson asked appellant to "just give him the gun back." (Tr. 181.) Appellant looked at Robinson and stated, "[h]e's got to get out of the car and get it hisself." (Tr. 181.)

{¶ 9} Robinson testified that appellant and Green began struggling over the weapon and "[a] round went off." (Tr. 181.) Green dropped the gun and appellant fell backwards. Appellant then got up and "rushed towards the car as Josh was reaching down for the weapon." (Tr. 181.) Appellant overpowered Green by lifting him and punching him. After the last punch, "Josh slumped down in the vehicle and went to raise up back out of the vehicle, and that's when a couple shots went off." (Tr. 181–182.) Appellant was in control of the weapon at the time the shots were fired. After the shooting, appellant went into the apartment building and knocked on Robinson's door, but Robinson refused to let appellant inside his apartment. Robinson phoned 911 to seek help for Green.

{¶ 10} Ford also testified regarding the shooting incident. When Ford arrived at the apartments, he observed Green "struggling, getting hit. He wasn't in control. He was—he had his hand, like, out the car window * * *. His arm was being held down, and he was being punched." (Tr. 137.) Appellant was holding Green's arm with one hand, and punching Green in the head with the other hand. Green had a gun in his right hand. According to Ford, Green was attempting to get away from appellant but was overpowered because "[h]e's a real little guy." (Tr. 143.)

{¶ 11} Appellant, who was pulling at Green, then fell with the gun in his hand, "got up, said, 'Fuck you, motherfucker' [and] [s]hot two times." (Tr. 138.) Appellant was approximately one foot away from Green, near the car window, when he fired the shots. Appellant "fired the first shot at the passenger window, took a few steps towards the back, and shot at the side back window" on the driver's side. (Tr. 140.) According to Ford, there was an interval of approximately five to seven seconds between the shots.

{¶ 12} Appellant then walked into the apartment building. Ford ran over to the car, put his right hand on Green's shoulder and "knew he was dead." (Tr. 141.) Ford phoned the police and waited by his friend's car. The engine was still running, and Ford noted that the transmission was in "park." Just after the shooting, Ford heard the engine "rev up" from Green's foot pushing down on the accelerator. (Tr. 143.)

{¶ 13} Ford stated that, during the altercation, appellant "could have stopped at any time. He was in control of the situation ." (Tr. 144.) After the incident, Ford

described the assailant to police officers as an individual approximately six foot two inches in height, weighing between 230 and 250 pounds. Ford was subsequently contacted by police detectives and shown a photo array, and he picked out a photograph from the array. Ford testified that the weapon he saw appellant take from Green's hand was the .38 caliber revolver that he (Ford) owned.

{¶ 14} Columbus Police Officer Napoleon Bell was one of the first officers dispatched to 3094 East Livingston Avenue following the shooting. When he arrived at the scene, Officer Bell observed a shooting victim slumped over in a vehicle. The car engine was running when the officer arrived, and he turned the engine off "because it was grinding," and he "thought it might go into gear." (Tr. 36.) The officer did not notice any indication of breathing by the victim who was subsequently pronounced dead at the scene.

{¶ 15} Columbus Police detectives collected various items from the victim's vehicle, including a cell phone, and a white sock containing six bullets. The sock and bullets were recovered from the middle console area. The officers did not find any weapons in the victim's car.

{¶ 16} At trial, the prosecution presented the videotaped testimony of Dr. Keith N. Norton, Deputy Coroner with the Franklin County Coroner's Office, who had performed an autopsy of the shooting victim. Dr. Norton described three separate gunshot wounds to the victim. He first noted a gunshot wound on the left side of the victim's head, behind the left ear. The presence of soot on the inside surface of the skull indicated that the weapon was either in contact with the skin or very close to the skin. Dr. Norton opined that the cause of death was the head wound, which extended to the base of the victim's skull and damaged part of the spinal cord.

{¶ 17} Dr. Norton noted two other gunshot wounds to the victim's left upper shoulder. One of the shoulder wounds passed through the victim's neck. Dr. Norton opined that both of the shoulder wounds, which were non-lethal, were also fired within close range of the victim. All three wounds entered the victim's left side. A toxicology report indicated that the victim had .08 grams percent of alcohol in his blood, and he also tested positive for the presence of marijuana.

{¶ 18} Appellant testified on his own behalf and gave the following account of the events on August 22, 2002. On that date, appellant resided at the Greenbriar Apartments, located at 3082 Columbus Avenue. At approximately 3:30 p.m., Macaette Robinson and appellant's cousin, Donnie Stevens, came to appellant's apartment, woke him up and asked him to get in their car for a ride.

{¶ 19} Eventually, they drove to the Bexley Plaza Apartments. According to appellant, he began helping an individual he identified as George, who was getting ready to move out of the apartment complex. Joshua Green, who was also at the apartment complex, approached appellant and asked him about a pistol; appellant told Green he did not have the weapon. Appellant and George later left for

4

approximately 45 minutes. When they returned, Green approached him again, and "says everybody says that I have his gun. I told him I don't have his gun." (Tr. 295.) Appellant then went to his car and left the parking lot in a hurry, stating that he would be back. Appellant denied that Green drove him to a drive-thru that day; rather, appellant stated that he walked to the drive-thru to get a "Black & Mild" cigar. (Tr. 294.)

{¶ 20} Appellant was drinking beer with Stevens, Robinson and two other individuals when Green returned about 20 minutes later. Green said to appellant, "[c]ome here, let me talk to you." (Tr. 296.) Appellant went over toward Green's car, and Green again asked appellant about a gun. Appellant told Green he did not have the gun, and Green became angry, and "his voice is slurred." (Tr. 297.) Green said to appellant, "I know you have my pistol, and I want you to give me my damn pistol." (Tr. 297.) According to appellant, "[w]hen I tell him I don't have his pistol and try to walk away from the car, walk away from him again, that's when I seen him reach beside him on the side of the seat and produce a pistol and shoot." (Tr. 297.) Appellant stated that Green shot twice, the first time while appellant was pushing Green's hand away from him, and the second time while appellant had both hands on the weapon.

{¶ 21} As the two men struggled over the weapon, appellant managed to position his thumb and finger between the hammer and firing pin of the revolver. Appellant related that, on a prior occasion, he had been shot in the stomach, so "I actually was not myself after he shot at me. I was scared for my life." (Tr. 298–299.) Green started to bite appellant on the arm and, in response, appellant punched Green on top of his head with his right fist. Appellant stated he was both scared and angry. Eventually, appellant pulled his arm free from Green and pulled the gun out of his hand. Appellant fell backwards to the ground, and then "rose up off the ground" and "shot him twice in the side." (Tr. 301.) According to appellant, at the time he was shooting, Green was reaching down by the console of the car "where he first produced the first gun from, so I'm still in fear of my life." (Tr. 301.) Appellant fired another shot and took off running. Appellant stated that he fled the shooting scene and did not turn himself into police because he was on probation and was scared for his life. Appellant believed that, if he had turned and walked away after wrestling the gun away, Green would have shot him in the back.

{¶ 22} On cross-examination, appellant stated he did not know where the individual named George was moving because "[w]e never made it to that destination. We had rode for 45 minutes, and he turned around, dropped me back off, 'cause something had happened ." (Tr. 309.) According to appellant, Green broke the glass in the back window of the car by shooting at him. Appellant, who stated he weighed 245 pounds, acknowledged that, after shooting Green twice, he said "Fuck you, motherfucker," prior to firing the final shot. (Tr. 320.) Appellant denied knowing that the gun was pointed at Green's head when he fired the last shot. When asked what he did with the weapon, which was never recovered, appellant stated that he threw it in a trash can as he was running from the scene. Appellant denied stopping

at Robinson's apartment after the shooting incident. Rather, he stated that he went back to his apartment and fell asleep.

{¶ 23} The jury returned a verdict finding appellant guilty of voluntary manslaughter. The trial court sentenced appellant by judgment entry filed on July 29, 2003.

{¶ 24} On appeal, appellant sets forth the following three assignments of error for review:

ASSIGNMENT OF ERROR NO. 1:

The trial court erred in entering a judgment of conviction because the jury's verdict was not supported by sufficient evidence and was against the manifest weight of the evidence.

ASSIGNMENT OF ERROR NO. 2:

The trial court erred in imposing the maximum sentence upon appellant without complying with the statutory requirements of R.C. Chapter 2929.

ASSIGNMENT OF ERROR NO. 3

The trial court erred in journalizing a defective sentencing entry, requiring remand for a new sentencing hearing.

*State v. Brown*, 10th Dist. No. 03AP-858, 2004 WL 2803425, at *1-4 (Ohio Ct. App. Sept. 23, 2004). On September 23, 2004, the state appellate court affirmed Petitioner's second assignment of error and remanded the case for re-sentencing. *Id*. Petitioner apparently did not file an appeal to the Ohio Supreme Court. The website of the Franklin County Clerk indicates that, on March 21, 2005, the trial court re-sentenced Petitioner to nine years, plus three years for use of the firearm. Petitioner apparently did not file an appeal.

On July 1, 2019, Petitioner filed this pro se habeas corpus Petition. He indicates that he has been released from prison (*see Petition*, ECF No. 1, PAGEID # 15), but asserts that he is being held against his will by the State of Ohio and that the provision of his sentence, including a term of post-release control, is in violation of the Double Jeopardy Clause (claim one) and that the trial

court did not advise him that the provision of post-release control would be a part of his sentence (claim two).[2]

However, Petitioner never raised these claims in the Ohio Courts. Thus, this action remains unexhausted.

## II. EXHAUSTION

A state prisoner must exhaust his available remedies in the state courts before a federal habeas court may grant relief. *Silverburg v. Evitts*, 993 F.2d 124, 126 (6th Cir. 1993). If a habeas petitioner has the right under state law to raise a claim by any available procedure, the claim is not exhausted. 28 U.S.C. § 2254(b), (c). Moreover, a constitutional claim for relief must be presented to the state's highest court in order to satisfy the exhaustion requirement. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). A habeas petitioner bears the burden of demonstrating exhaustion of the available state court remedies with respect to the claims presented for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987). Petitioner has failed to meet this burden here.

Petitioner asserts that he is being "kidnapped" and held against his will and further states that he served all of his sentence in prison, but is still serving time under the provision of post-release control in violation of the Double Jeopardy Clause. He alleges that he was not previously notified that post-release control would be a part of his sentence. To the extent Petitioner alleges that his sentence has fully expired, a habeas corpus action in the Ohio courts can be used to challenge actions taken by the OAPA when such actions result in a person being confined after

---

[2] Petitioner indicates that post-release control was not "spoken of or enter[ed]" by the trial judge and at the time of trial the judge did not advise him that he would be placed on post-release control, and that it also was not a part of his plea agreement when he pleaded guilty. (*Petition*, ECF No. 1, PAGEID # 8.) The Court is unable to determine the nature of Petitioner's reference to a guilty plea and assumes such reference to be in error.

jurisdiction over him has expired. *Brewer v. Dahlberg*, 942 F.2d 328, 337-40 (6th Cir. 1991) (citing *In re Anderson*, 380 N.E.2d 368, 369 (Ohio Ct. App. 1978)). Petitioner does not allege that he has filed a habeas action in the state court.

Under Ohio law, a writ of mandamus is also available if a petitioner can demonstrate (1) that a clear legal right to relief exists; (2) that the respondent has a clear legal duty to perform the requested act; and (3) that no plain and adequate remedy exists in the ordinary course of the law. *State ex rel. Berger v. McMonagle*, 451 N.E.2d 225, 227 (Ohio), *cert. denied*, 464 U.S. 1017 (1983). Ohio courts have heard petitions for mandamus that challenge the actions of the OAPA. *See Brewer v. Dahlberg*, 942 F.2d at 335–36 (collecting cases regarding mandamus petitions and the OAPA); *see also State ex rel. Mapson v. Ohio Adult Parole Auth.*, 535 N.E.2d 296, 297 (Ohio 1989) (*per curiam*) (petitioner did not have sufficient evidence to prove retaliatory motive for parole denial); *Rodgers v. Capots*, No. 93-3397, 1993 WL 483476, at *1 (6th Cir. Nov. 23, 1993) (denial of habeas corpus petition appropriate when petitioner did not exhaust available state court remedies, including a writ of mandamus). Thus, a mandamus petition can be used in some instances to pursue relief from improper incarceration by the OAPA. Petitioner does not, however, allege that he has filed an action for mandamus.

Moreover, to the extent Petitioner complains that his sentence did not include provisions for post-release control, although he may now no longer pursue a direct appeal, review may still be available through collateral attack in the Ohio courts. The OAPA cannot impose post-release control sanctions unless a trial court has imposed post-release control in its sentence. *See State v. Billiter*, 980 N.E.2d 960, 964 (Ohio 2010). Although Ohio Revised Code § 2967.28 provides that post-release control is mandatory for certain offenses, a sentencing entry by an Ohio court must contain the following information:

> (1) whether postrelease control is discretionary or mandatory, (2) the duration of the postrelease-control period, and (3) a statement to the effect that the Adult Parole Authority ("APA") will administer the postrelease control pursuant to R.C. 2967.28 and that any violation by the offender of the conditions of postrelease control will subject the offender to the consequences set forth in that statute."

*State v. Hardy*, No. 17 CA 11, 2017 WL 6550471, at *3 (Ohio Ct. App. Dec. 12, 2017) (quoting *State v. Grimes,* 85 N.E.3d 700, 702 (Ohio 2017)). "A sentence that does not include the statutorily mandated term of postrelease control is void, is not precluded from appellate review by principles of res judicata, and may be reviewed at any time, on direct appeal or by collateral attack." *State v. Fischer*, 942 N.E.2d 332, ¶ 1 of the syllabus (Ohio 2010). Here, Petitioner has failed to allege that he attempted to collaterally attack his sentence in the state court on this basis.

### III. RECOMMENDED DISPOSITION

For the reasons set forth above, it is **RECOMMENDED** that this action be **DISMISSED** without prejudice as unexhausted**.**

### PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report

and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

> /s/ *Chelsey M. Vascura*  
> CHELSEY M. VASCURA  
> UNITED STATES MAGISTRATE JUDGE